IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA R. HELWAGEN, | ) | Case No. 5:22-CV-01467 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Lisa R. Helwagen, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Helwagen argues that a remand under Sentence Six of 42 U.S.C. § 405(g) is warranted so

that an Administrative Law Judge ("ALJ") can consider new and material evidence.  Helwagen

also challenges the ALJ's negative findings, contending that the ALJ erred in evaluating her:

(i) subjective symptom complaints; and (ii) residual functional capacity ("RFC") by finding she

was capable of performing light exertional work and failing to include a limitation for her use of

a cane.

A remand pursuant to Sentence Six is not warranted because Helwagen has not

established that the evidence upon which she seeks a remand is "new" or "material."  Moreover,

because the ALJ applied the proper legal standards and reached a decision supported by

substantial evidence, I recommend that the Commissioner's final decision denying Helwagen's applications for DIB and SSI be affirmed.

## I.     Procedural History

Helwagen applied for DIB and SSI on April 2, 2020.  (Tr. 581, 595-596).[1]  Helwagen alleged that she became disabled on January 24, 2018, due to (i) post-traumatic stress disorder ("PTSD"), (ii) depression, (iii) anxiety, (iv) back disc problems, (v) brain meningioma, (vi) carpal tunnel syndrome, (vii) lung nodules, (viii) thyroid nodules, (ix) a sleep disorder, (x) asthma, (xi) acid reflux disease, and (xii) arthritis and chronic pain.  (Tr. 611, 628).  The Social Security Administration denied Helwagen's claim initially and upon reconsideration. (Tr. 496-505, 507-515).

On January 21, 2021, ALJ Paula Goodrich heard Helwagen's case telephonically and denied her application in a March 25, 2021 decision.  (Tr. 355-368, 402-443).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Helwagen had the RFC to perform light work, with the following limitations:

> [Helwagen] may frequently balance, occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; the claimant may frequently handle and finger with the bilateral upper extremities; the clamant must avoid all exposure to unprotected heights, and hazardous machinery; the claimant is limited to the performance of simple, routine tasks, conducted in a setting free of high production quotas or fast-pace production demands, which setting requires no public interaction, and no more than occasional interaction with co-workers, but which does not involve customer service duties, confrontation, conflict resolution, the direction of, or persuasion of, others, which setting contemplates no more than occasional changes in the workplace tasks or duties, gradually introduced, and explained in advance.

(Tr. 361).

---

[1] The administrative transcript appears in ECF Doc. 7.

Helwagen requested review by the Appeals Counsel, submitting additional evidence. (Tr. 8-340, 346-351, 374-399, 531).  The Appeals Counsel determined that those medical records predating the ALJ's decision did not show a reasonable probability that the outcome of the decision would be different, and those post-dating the decision did not relate to the adjudicative period at issue.  (Tr. 2).  The Appeals Counsel declined further review, rending the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  On August 17, 2022, Helwagen filed a complaint to obtain judicial review.[2]  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Helwagen was born on December 10, 1970 and was 47 years old on the alleged onset date.  (Tr. 640).  She graduated from high school in 1988 and had previously worked as a secretary, but the ALJ determined she had no past relevant work.  (Tr. 366, 612-613).

### B.    Relevant Medical Evidence

#### 1.    Physical Health Medical Evidence

On September 11, 2018, Helwagen was seen for thyroid nodules.  (Tr. 1110).  A review of her systems and physical examination results were, generally, normal.  (Tr. 1110-1112).  She was assessed with nodular goiter, based on an ultrasound performed in office, and her management options were discussed.  (Tr. 1112).  She indicated she was in favor of re-aspiration of the nodule with genetic testing.  *Id.*  Later, the nodule was biopsied and genetic testing was negative for a mutation and indicated a less than 3% chance of malignancy.  (Tr. 1109).

On January 11, 2019, Helwagen was seen for a urology consultation regarding her stress urinary incontinence.  (Tr. 1106).  She reported that she had episodes 5 to 6 times a day and

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

would experience leakage when coughing, sneezing, laughing, doing physical exercising, and lifting or bending, and would feel a sense of urgency.  *Id.*  A review of her systems and her physical examination results were, generally, normal.  (Tr. 1107-1108).  Her treatment options were discussed, and she took them under consideration.  (Tr. 1108).

On January 17, 2019, Helwagen saw Naomi Tyree, M.D., complaining of a cough. (Tr. 672-673).  Dr. Tyree noted her prior diagnoses of anxiety, degenerative disc disease, fatty liver, gastroesophageal reflux disease ("GERD"), and thyroid nodules.  (Tr. 676).  Helwagen reported shortness of breath, wheezing, and bloody urine; that she'd had those symptoms for a couple of days; and that she was being treated for her urinary issues.  (Tr. 673).  A review of her systems was consistent with Helwagen's complaints, and, on physical examination, she was normal.  (Tr. 677-678).  She was assessed with an exacerbation of her asthma, for which she was prescribed an albuterol nebulizer, and additional testing and consultations were ordered for her urinary issues.  (Tr. 678).

On February 4, 2019, Helwagen was seen for urinary incontinence.  (Tr. 1100-1101).  A review of her systems and physical examination results were, generally, normal.  (Tr. 1103).  It was planned for her to have a suspension bladder sling tape transobturator procedure.  (Tr. 1104). Helwagen underwent the procedure, and was noted as doing well afterwards.  (Tr. 1084-1097).

On March 15, 2019, Helwagen returned to Summa Health for a follow-up appointment. (Tr. 686).  Her history of depression was noted, and she indicated she had never grieved the passing of loved ones, but she felt she was doing well on Cymbalta and was willing to see a counselor.  (Tr. 687).  She also noted that Xanax helped with her anxiety, but she wanted other medication because of the frequency she took it.  *Id.*  Regarding her asthma, she stated that she was using the albuterol 2 to 3 times a week.  *Id.*  Helwagen also reported chronic neck and back

4

pain, noting her hands and arms were numb when she woke up and her back pain was in her mid

to upper back.  *Id.*  A review of her symptoms indicated she had a dysphoric mood and sleep

disturbances, but, on physical examination, she was normal.  (Tr. 688, 691).  She was assessed

with anxiety with depression, grief, asthma, chronic neck pain, cervical radiculopathy, and

chronic midline back pain, among other things.  (Tr. 691).  Her medication for anxiety and

asthma were updated and she was referred to a pain management specialist.  (Tr. 691-692).

On March 21, 2019, Helwagen saw Guang Yang, M.D., a pain management specialist,

for neck and back pain.  (Tr. 952).  She described the pain as tingling, numbness, shooting,

radiating, and "hot-burning", persisting since childhood, and worsening with moving her head

and sitting or standing a long time.  *Id.*  On physical examination, Dr. Yang observed that

Helwagen was overweight and had slight difficulty standing from a seated position, tenderness

with palpation and mildly limited extension rotation in her lumbar and cervical spine, decreased

lordosis in her lumbar spine, and trigger points in her musculoskeletal system.  (Tr. 953-954).

He assessed Helwagen with "other chronic pain," cervicalgia, low back pain, and radiculopathy

in the cervical and lumbar regions of her spine.  (Tr. 954).

The same day, Dr. Yang also conducted a mental status evaluation.  (Tr. 958-959).  He

observed that Helwagen was fully oriented and well groomed, and had appropriate eye contact,

good concentration, intact memory, appropriate affect, a happy mood, intact judgment, a realistic

self-concept, and no hallucinations, delusions, or ideations.  (Tr. 958).  He assessed Helwagen

with an adjustment disorder with depressed mood.  (Tr. 959).  He started Helwagen on a sodium

tablet and Percocet, referred her to physical therapy and a behavioral health specialist, and

ordered imaging and labs.  (Tr. 954-955).

On April 15, 2019, Helwagen saw Dr. Yang, and his physical examination results and assessment were the same.  (Tr. 948-950).  He refilled her prescriptions.  (Tr. 950).  Three days later, Helwagen returned for pain in her arms and shoulders, which Dr. Yang assessed as carpal tunnel syndrome in her right arm.  (Tr. 946).  He conducted an EMG that indicated there was distal right median mononeuropathy across the wrist indicative of mild carpal tunnel and no cervical radiculopathy bilaterally in her upper extremities.  (Tr. 946, 967).

On April 19, 2019, Helwagen was evaluated for physical therapy.  (Tr. 972).  For her lumbar region, it was noted that she had about a 50% limitation in her range of motion, except for her extension which had a 75% limitation.  *Id.*  The range of motion in her legs was generally within normal limits, except for her hip external rotation and extension, which were both reduced.  *Id.*  It was noted she had tenderness with palpation to the lumbo-sacral area of her spine, moderate tightness in her hamstrings, hip rotators, and calf.  (Tr. 973).  The plan was for her to have therapy one time a week for three weeks.  *Id.*

On April 25 and May 10, 2019, Helwagen saw Dr. Yang for pain, including in her lower back and hips.  (Tr. 940, 944).  During her April 25 appointment, Dr. Yang conducted a radiculopathy study of her lumbar section, which indicated no local nerve damage.  (Tr. 944, 965).  At her subsequent appointment, Dr. Yang's physical examination observations and assessment remained largely unchanged, save for his additional notation of pain in both wrists, carpal tunnel syndrome, and spinal instabilities.  (Tr. 940-941).  He adjusted Helwagen's medication, instructed her to continue physical therapy and exercises at home, and referred her for imaging, a brace, and for a steroid injection.  (Tr. 941-942).

On May 20, 2019, Helwagen underwent x-rays of her cervical and lumbar spine, both of which indicated no acute pathology was present.  (Tr. 961, 963).  Her lumbar spine, however, did have bilateral facet arthropathy.  (Tr. 963).

On June 5 and July 15, 2019, Helwagen saw Dr. Yang, and his physical examination observations and assessment were, largely, the same.  (Tr. 928-929, 936-938).  He refilled her prescriptions and encouraged her to continue physical therapy.  (Tr. 928-929, 937-938).  The following day she received an injection for her sacroiliac joint and, later, received a right wrist brace.  (Tr. 932, 934-935).  During the later visit, Dr. Yang ordered another injection into Helwagen's right hip, noting improvement after her last one.  (Tr. 930).

On July 29, 2019, Helwagen saw Dr. Tyree, complaining of a dry cough she'd had for several months.  (Tr. 707).  She reported feeling short of breath when active and using an albuterol inhaler 2 to 3 times a day to get relief.  (Tr. 708).  She also noted that her GERD was uncontrolled, her cough was unaffected by her shortness of breath, and she was still smoking but was down to half a pack a day.  *Id.*  A review of her systems indicated she had a cough, shortness of breath, wheezing, GERD episodes, and a dysphoric mood.  (Tr. 712).  On physical examination, she was generally normal, except she had faint wheezing "with rhonchi lower base" and decreased basilar air movement.  (Tr. 713).  Dr. Tyree assessed Helwagen with a persistent cough, moderate persistent asthma without complication, and GERD with esophagitis, and prescribed medication.  *Id.*

On August 5, 2019, Helwagen had a steroid injection for her hip.  (Tr. 926-927).

On August 13, September 10, October 9, and November 1, 2019, Helwagen saw Dr. Yang, and his physical examination observations and assessments were the same, except for the addition of myalgia to his assessment in August.  (Tr. 908-909, 912-913, 918-919, 922-923).

During their August appointment, Dr. Yang referred Helwagen for a TENS unit and gave her an injection, noting they had helped her pain in the past.  (Tr. 922-923).  He otherwise made minor adjustments to her medication and instructed her to continue physical therapy.  (Tr. 910, 913-914, 919-920).  During the November appointment, he also gave her a joint injection, noting it helped her pain.  (Tr. 910).

On November 22, 2019, Helwagen was fitted for a TENS unit and several days later, she received a joint injection for her spinal instability.  (Tr. 902, 906).

On December 6, 2019, Helwagen saw Dr. Yang.  (Tr. 898).  His physical examination and assessment were the same.  (Tr. 899-900).  He refilled her prescriptions and instructed her to continue physical therapy.  (Tr. 900-901).

On January 3, 2020, Helwagen saw Dr. Tyree, complaining of a cough and sinus pressure she'd had for 4 to 5 days.  (Tr. 718).  She reported treating them with a nebulizer, and also indicated she had intermittent headaches with "lots of pressure" and a few auras.  (Tr. 719).  She indicated the headaches occurred a few times a month and lasted a few hours, but where unrelated to her sinus issues.  *Id.*  It was noted that she had undergone an MRI in 2016, but that showed non-specific changes regarding her headaches and medication had, thus far, been ineffective.  *Id.*  A review of her systems noted her visual auras, and those areas where she needed to follow up with specialists.  (Tr. 726).  On physical examination, she was normal.  (Tr. 726-727).  In addition to her continuing conditions, Helwagen was assessed with acute sinusitis and instructed on caring for the condition.  (Tr. 727-728).

On January 7, 2020, Helwagen saw Dr. Yang, and his physical examination observations and assessment were the same.  (Tr. 894-896).  He refilled her prescriptions, noted the injections

had helped with her pain, and instructed her to continue physical therapy.  (Tr. 896-897).  He also gave her a trigger point injection.  (Tr. 897).

On January 10, 2020, Helwagen underwent an MRI of her brain, which showed an "increase in the size of her meningioma and stable areas of non-specific changes that can go along with a migraine syndrome."  (Tr. 764).  It was recommended she see a neurologist.  *Id.*

On January 15, 2020, Helwagen saw her doctor regarding her nodular goiter.  (Tr. 1041).  A review of her systems indicated she had malaise/fatigue, back pain, joint pain, myalgias, and neck pain.  *Id.*  Her physical examination results were normal, and the nodule was found to be stable in size.  (Tr. 1043).  Her tests would be repeated in two years.  *Id.*

On January 29, 2020, Helwagen underwent a fluoroscopy esophagram, which showed continued reflux; she was instructed to seek a referral for more advance treatment options if the condition was bothersome.  (Tr. 767).

On February 2, 2020, Helwagen saw a glaucoma and eye specialist, was diagnosed with mild, bilateral pigmentary glaucoma, and was prescribed eye drops.  (Tr. 1485-1486).

On February 2, 2020, Helwagen saw Dr. Yang, and his physical examination observations and assessment were largely the same.  (Tr.  890-892).  He refilled her prescriptions and instructed her to continue physical therapy.  (Tr. 892-893).

On February 5, 2020, Helwagen saw a neurosurgeon for her headaches.  (Tr. 1455).  A review of her systems was generally normal, save for numbness in her hands and headaches.  (Tr. 1460).  Her physical examination results were normal, and her motor strength was noted as being 5/5.  (Tr. 1460-1461).  A mild limp was noted in her gait and an MRI revealed a small "fall."  (Tr. 1461).  The neurologist suggested repeating the MRI in 3 to 6 months and see if there was a significant change in symptoms.  (Tr. 1462).

9

On March 5, April 3, and May 1, 2020, Helwagen saw Dr. Yang. (Tr. 878, 882, 886). His physical examination observations and assessments were the same. (Tr. 878-880, 883-884, 887-888). He refilled her prescriptions and instructed her to start physical therapy. (Tr. 880-881, 884, 888-889). During the April appointment, Dr. Yang also started Helwagen on a Medrol tablet therapy pack. (Tr. 884).

On May 28, 2020, Helwagen received a sacroiliac joint injection in the lumbosacral region of her spine. (Tr. 875).

On June 2, 20220, Helwagen saw Dr. Yang. (Tr. 1288). On physical examination, Dr. Yang's observations were largely the same, as were his assessments. (Tr. 1289-1290). He continued her medication and provided her an injection, noting that the injection a few days prior had provided about a 50% reduction in pain. (Tr. 1290-1291).

On June 15, 2020, Helwagen saw a doctor regarding liver disease. (Tr. 1031). She had experienced increased liver function test ("LFT") results since 2017. *Id.* She was diagnosed with fatty metamorphosis of her liver and advised to lose weight. (Tr. 1033).

On June 17, 2020, Helwagen saw Dr. Tyree, regarding her hyperlipidemia, hypertension, and obesity. (Tr. 990). It was noted that Helwagen was not following the diet designed to help reduce her lipids, but was exercising and her blood pressure was well-controlled at home. (Tr. 991-992). Helwagen reported that her headaches were about the same, and she was still having fatigue issues and her restless leg syndrome seemed worse. (Tr. 994). In a review of her systems, it was noted that her breathing was doing well, and she was positive for fatigue; chronic back, neck, and arm pain; and sleep disturbances. (Tr. 997). Her physical examination results were normal. (Tr. 998). Dr. Tyree assessed her with fatty liver, obesity, excessive daytime sleepiness, snoring, obesity, and hypertension and referred her to specialists for care. *Id.*

On June 19, 2020, Helwagen received a trigger point injection.  (Tr. 1285).

On June 23, 2020, Helwagen saw Dr. Tyree to follow up from her appointment with the neurosurgeon.  (Tr. 1467-1468).  A review of her systems indicated she had back and neck pain and numbness.  (Tr. 1471).  On physical examination, her results were, generally, the same, noting that her motor strength was 5/5.  (Tr. 1472).  Dr. Tyree noted that the MRI revealed "a tiny homogeneously enhancing mass consistent with meningioma."  *Id.*  And she recommended having another MRI in one year, as the mass had not changed within the past six months. (Tr. 1473).  Dr. Tyree also recommended MRIs of Helwagen's spine because her pain had not significantly improved with her other treatment.  *Id.*

On July 1, 2020, Helwagen saw Dr. Yang, and his physical examination observations and assessment were the same.  (Tr. 1280-1282).  He continued her medication.  (Tr. 1282-1283).

On August 3, 2020, Helwagen saw Dr. Tyree, regarding her carpal tunnel syndrome. (Tr. 980).  Helwagen reported getting injections, being fitted for a brace which she thought helped some, and that a carpal tunnel nerve conduction showed severe deterioration on the right and some on the left.  (Tr. 981).  A review of her systems indicated she had arthralgias, back pain, syncope, weakness, numbness, and a dysphoric mood.  (Tr. 985).  Her physical examination results were normal, and she was assessed with bilateral carpal tunnel syndrome, and other diagnoses she received treatment for elsewhere.  *Id.*  She was referred to an orthopedist for her uncontrolled pain and decreased grip strength.  (Tr. 986).

On August 4 and 28, and September 18 and 25, 2020, Helwagen saw Dr. Yang. (Tr. 1263, 1268, 1270, 1275).  When conducted, Dr. Yang's physical examination observations and assessment were, largely, the same.  (Tr. 1263-1265, 1268, 1271-1272, 1276-1277).  He continued her medication, except her ibuprofen which he replaced with Celebrex, and instructed

her to use a handicap parking placard.  (Tr. 1265-1266, 1272-1273, 1277-1278).  And during her last two appointments, she gave her trigger point injections for her myalgia.  (Tr. 1268, 1273).  Dr. Yang noted that one of her injections provide a 60% pain reduction.  (Tr. 1273).  Additionally, during her last appointment, Dr. Yang ordered imaging for her knees, which indicated she had mild degenerative change in her knees but no acute bony abnormalities.  (Tr. 1266, 1296).

On October 7, 2020, Helwagen saw her fatty liver specialist.  (Tr. 1326).  She had abnormal liver enzymes, but her LFTs had improved.  *Id.*  She was instructed to start Zocor and have her LFT's checked after starting the medication.  (Tr. 1329).

On October 28, 2020, Helwagen had a telehealth visit with her pain management specialists because she had COVID-19.  (Tr. 1259-1261).  Her medications were continued, except Celecoxib and she was given a handicap parking placard.  (Tr. 1261).

On November 17, 2020, Helwagen had a follow-up examination regarding her bladder mesh exposure, and they planned on having the mesh removed.  (Tr. 1320-1321).

On December 2, 2020, Helwagen saw Dr. Yang, and his physical examination observations and assessment were, generally, the same as in her prior appointments, except he added osteoarthritis in her knees.  (Tr. 1254-1256).  He continued her medication, except her Celecoxib; provided her a sacroiliac joint injection, noting that her prior injections had reduced her pain; and prescribed her Voltaren gel for her knees.  (Tr. 1256-1257).

On December 16, 2020, Helwagen obtained a second opinion on whether she needed to have the mesh erosion excised, which was ultimately recommended.  (Tr. 1572-1574).

12

On December 23, 2020, Helwagen saw Dr. Yang, and his physical examination observations and assessment were the same.  (Tr. 1249-1251).  Dr. Yang refilled Helwagen's medications and gave her an injection.  (Tr. 1251-1252).

On February 3, 2021, Helwagen received a "referral" for use of a cane "to assist ambulation" from Dr. Yang.  (Tr. 1545).

On February 8, 2021, Helwagen had an operation to excise the bladder mesh she previously had placed and was later noted as recovering well.  (Tr. 1565, 1568).

On February 18, 2021, Helwagen saw rheumatologist William McCord, M.D. (Tr. 1546).  He diagnosed Helwagen with lumbar disc disease, fibromyalgia, irritable bowel syndrome, obstructive sleep apnea, and osteoarthritis in both hands.  (Tr. 1547).  A review of her systems indicated she was positive for facial swelling, apnea, weakness and numbness in her arms and hands.  (Tr. 1548).  On physical examination, she was, generally, normal, save a notation for "EARLY HEBERDEN/BOUCHARD'S NODES HANDS."  (Tr. 1552-1553).

On May 26, 2021, Helwagen had a follow-up appointment regarding her glaucoma and indicated that she was not having problems at that time.  (Tr. 486).

## 2.    Mental Health Medical Evidence

On May 30, 2019, Helwagen had a psychology appointment with Elizabeth Carroll, CNP. (Tr. 1079).  She reported the family losses she had suffered the past few years and endorsed a low mood, energy, and motivation.  *Id.*  She indicated she also had disrupted sleep due to anxiety, which had increased over the past year, as well as intrusive memories, avoidance behaviors, nightmares, issues with clutter, and feelings of being overwhelmed.  (Tr. 1079-1080).  Carroll observed that Helwagen was casually dressed and fully oriented; and had normal speech; a depressed, anxious mood with congruent, restricted, weary affect; intrusive memories; a

grossly intact cognition; no delusions, hallucinations, or ideations; true insight; intact judgment; and a normal gait.  (Tr. 1082).  A review of her systems was, generally, normal save for her disrupted sleep.  (Tr. 1082-1083).  Carroll diagnosed Helwagen with major depressive disorder, panic attacks, long-term medication use, and bereavement.  (Tr. 1083).

On June 24 and July 22, 2019, Helwagen saw Carroll for therapy.  (Tr. 1068, 1074). During her June visit, she reported that Xanax was helpful in reducing her anxiety, and in both she indicated her energy and motivation were low, in June adding that she had a low mood. (Tr. 1068, 1075).  Carroll's mental status examination observations and assessment were largely the same.  (Tr. 1070, 1077-1078).  However, in June Carroll reported improvement in Helwagen's mood, but noted Helwagen was dysphoric with concurrent tense affect, as well as being irritable and reactive during her July appointment.  (Tr. 1070, 1077).

On August 15, 2019, Helwagen saw Shanthi Rubin, APRN.  (Tr. 1063-1067).  Helwagen reported that she felt constantly tired, worried about "everything" since starting Prozac, and recounted stressors in her life.  (Tr. 1063).  Following a mental health status examination, Rubin observed that Helwagen was cooperative, fully oriented, and appropriately groomed.  (Tr. 1066). She also observed that Helwagen had appropriate psychomotor activity, clear speech, an anxious affect, coherent thought process and content, no perceptual disturbances, present and adequate insight, appropriate judgment, and intact memory.  *Id.*  She assessed Helwagen with major depressive disorder, recurrent episode, moderate.  (Tr. 1067).  She continued Helwagen's prescriptions for Prozac and Xanax, added Abilify, and discontinued her gabapentin.  *Id.*

On September 10, 2019, Helwagen saw Rubin.  (Tr. 774).  She reported being very emotional and having difficulty handling her stress over the past weekend.  *Id.*  She also reported feeling overwhelmed, that her medication was not working, and being unmotivated, lethargic,

14

and disorganized.  *Id.*  Rubin's observations as to Helwagen's mental status were largely the same as her prior appointment.  (Tr. 774-775).  Helwagen also completed a depression screening questionnaire with Rubin.  (Tr. 775-776).  She indicated that she had little interest or pleasure in doing things more than half the days; felt down, depressed, or hopeless, several days; had trouble sleeping and felt tired nearly every day; had a poor appetite or overate more than half the days; and had trouble concentrating several days.  *Id.*  She also reported not being able to stop or control her worrying more than half the days, worrying too much about different things nearly every day, trouble relaxing nearly every day, being easily annoyed or irritable more than half the days, and feeling afraid nearly every day.  (Tr. 776).  Rubin diagnosed Helwagen with generalized anxiety disorder ("GAD") and major depressive disorder, recurrent and moderate. (Tr. 780).  Rubin prescribed Cymbalta, Lexapro, discontinued Helwagen's Prozac and Abilify, and continue her Xanax as needed.  *Id.*

On October 21, 2019, Helwagen again saw Rubin.  (Tr. 788).  Helwagen reported that she continued to have low energy and motivation, felt sleepy all day, and could not accomplish anything, which made her feel depressed and unhappy.  *Id.*  She underwent a sleep study which indicated she had excessive daytime sleepiness.  *Id.*  Rubin's observations of Helwagen's mental status were largely the same as before, as were Helwagen's responses to the depression screening questions.  (Tr. 788-789).  Rubin diagnosed Helwagen with excessive day time sleepiness and panic attacks, and started her on medication for the sleepiness, discontinued her Lexapro in the evening, and maintained her Cymbalta.  (Tr. 793).

On December 11, 2019, Helwagen saw Rubin and reported that she continued to have difficulty accomplishing tasks, a lack of interest in things, and feelings of apathy and a lack of motivation.  (Tr. 801).  Rubin's observations were, generally, the same as their prior

15

appointments, as were Helwagen's responses to the depression screening questions. (Tr. 801-802). Rubin maintained her assessments, discontinued Helwagen's Xanax, and increased her Nuvigil. (Tr. 805-806).

On January 8, 2020, Helwagen saw Kara Klein, LPCC, for therapy. (Tr. 816). Helwagen reported a series of sad family losses, and indicated that her energy "sucks," she had difficulty falling asleep, and she would wake up during the night. (Tr. 816-817). She also reported breaking down when she was alone, frequently crying, difficulty getting things down around the house, and having a poor appetite but gaining weight. *Id.* Helwagen's responses to the depression screening questions and Klein's observations on her mental status were consistent with those from Helwagen's appointments with Rubin. (Tr. 817, 821). Klein's treatment plan was to help Helwagen figure out the "root" cause of her condition, and learn to cope. (Tr. 821).

On February 18, 2020, Helwagen saw Rubin, expressing concerns about the state of her health and admitting she was stressed more often than not. (Tr. 829). She indicated her counseling and medication helped her cope with her stress. *Id.* Rubin's observations were largely the same as at their prior appointments, as were Helwagen's responses to the depression screening questions. (Tr. 829-831). Rubin maintained her diagnoses and continued Helwagen's medication. (Tr. 834).

On April 15, 2020, Helwagen had a telephonic counseling session with Klein. (Tr. 843). Helwagen reported increased panic attacks that would last about 30 minutes and build up over a few days, causing feelings of uneasiness, shakiness, trouble breathing, and "feeling closed." *Id.* Klein observed that Helwagen's mood was stable, and she had a congruent affect, good eye contact, appropriate behavior, developing insight and judgment, appropriate grooming, and no

16

delusions/hallucinations.  (Tr. 844).  Helwagen's responses to the depression screening questions were largely the same as her prior mental health appointments.  (Tr. 844-845).

On May 12, 2020, Helwagen had a telephonic appointment with Rubin.  (Tr. 853). Helwagen reported feeling highly anxious because of the COVID-19 pandemic, tired, and lethargic.  *Id.*  Rubin's observations were generally the same, as were Helwagen's responses to the depression screening questions.  (Tr. 853-855).  Rubin maintained her diagnoses and adjusted Helwagen's medication.  (Tr. 858).

On May 13, 2020, Helwagen had a telephonic counseling session with Klein.  (Tr. 863). Helwagen indicated that she continued to have panic attacks, despite not feeling triggered by anything, and discussed her relationships with her sons.  (Tr. 863-864).

On September 21, 2020, Helwagen saw Amy White, Psy.D.  (Tr. 1338).  Helwagen reported that she was doing "okay" but was tired, worried about family, and anhedonic. (Tr. 1339).  Dr. White noted Helwagen was active and engaged in the session; she observed that Helwagen was casually dressed and fully oriented, and had an open and cooperative attitude, no impairments to her attention or concentration, intact memory, unremarkable behavior, normal speech, mildly depressed mood, full and appropriate affect, logical and goal-directed thought processes, no delusions or hallucinations, fair insight, and appropriate judgment.  *Id.*

On September 24, 2020, Helwagen saw Rubin.  (Tr. 1331).  She reported feeling unmotivated and anhedonic, but that her therapy sessions were helping her cope.  (Tr. 1332). Her responses to the depression screening questions were largely the same as their prior appointments.  (Tr. 1332-1333).  Rubin's observations on a mental status examine were largely the same as before, noting that Helwagen's mood was anhedonic and her concentration was

impaired.  (Tr. 1334).  Rubin's assessment remained the same, she continued Helwagen's medications, and added Abilify.  (Tr. 1334-1335).

On October 5, October 20, November 6, and November 20, 2020, Helwagen saw Dr. White.  (Tr. 1318, 1322, 1324, 1329).  Helwagen reported that she was "okay," "so-so," or "plucking along;" and she struggled with or avoided thinking about losses in her life, or was exhausted and worried, and, during her October 20 session, described her mood as tense and anxious.  (Tr. 1318-1319, 1322, 1324, 1330).  Dr. White noted Helwagen was active and engaged and her observations on Helwagen's mental status were, generally, the same, reporting her mood as mildly depressed.  (Tr. 1319-1320, 1322-1325, 1330).

On December 9, 2020, Helwagen saw Rubin, reporting that she felt feeling "so-so," anxious, depressed, helpless, and hopeless at times, but thought Cymbalta was helpful. (Tr. 1315).  She also noted she was still very anxious, desired a short-acting medication for her anxiety, and had disputed sleep and an adequate appetite.  *Id.*  Helwagen's responses to the depression screening questions were largely the same, as were Rubin's observations as to her mental status.  (Tr. 1316).  Rubin continued Helwagen's medications.  (Tr. 1317).

On January 12, January 26, February 20, and February 24, 2021, Helwagen saw Dr. White.  (Tr. 457, 460, 463, 1310-1311).  In January, Helwagen reported that her mood was generally stable, although she was anxious about upcoming events, and, during her later appointment, admitted it was near the anniversary of a family death and she felt resentment towards a cousin.  (Tr. 457, 1311).  However, in February, Helwagen reported her mood was "not great" or she was just going through the days.  (Tr. 460, 463).  Dr. White noted that Helwagen was active and engaged.  (Tr. 458, 460, 463, 1311).  Dr. White's observations in Helwagen's mental status examination were, largely, the same.  (Tr. 458, 461, 464, 1311-1312).

On March 5, 2021, Helwagen saw Rubin, stating she was doing a little better, had been crying less, and was a "little bit" more motivated.  (Tr. 466).  She indicated she stopped taking the Abilify because she felt it made her more irritable and she only slept for two hours at a time, but she did not want to feel groggy during the day.  *Id.*  Rubin's observations on Helwagen's mental status and Helwagen's responses to the depression screening questions were largely the same as their prior appointments.  (Tr. 466-468).  Rubin maintained her assessment and continued Helwagen's medications, but stopped Abilify.  (Tr. 468-470).

On March 10, 2021, Helwagen saw Dr. White.  (Tr. 472).  Helwagen described her mood as "all right," but noted she was drained after her son's visit.  *Id.*  She admitted to blocking out past pain and avoiding focusing on it.  *Id.*  Dr. White noted she was active and engaged and her observations of Helwagen's mental status were largely the same.  (Tr. 473).

On March 17, 2021, Helwagen saw Rubin and noted she was doing well but was sad about her son moving.  (Tr. 476).  Rubin's observations on Helwagen's mental status and Helwagen's depression screening responses were, largely, the same.  (Tr. 476-478).  Rubin maintained her diagnoses and continued Helwagen's medication.  (Tr. 478-479).

On March 23, 2021, Helwagen saw Dr. White.  (Tr. 482).  She reported that things were "okay."  *Id.*  Dr. White noted that Helwagen was active and engaged, and her observations on Helwagen's mental status examination were, largely, the same.  (Tr. 483).

### C.    Relevant Opinion Evidence

### 1.    Medical Opinion – Amy White, Psy.D.

On November 6, 2020, Dr. White provided a letter, noting she began treating Helwagen in August 2020 and met on a biweekly basis.  (Tr. 1399).  Dr. White noted her diagnoses for Helwagen, including major depressive disorder, GAD, PTSD, and a pain disorder.  *Id.*

### 2.       Medical Opinion – Julie Mark, M.D.

On September 9, 2021, dermatologist Julie Mark, M.D., wrote a letter in support of Helwagen's disability.  (Tr. 444).  She stated that Helwagen suffered from severe hidradenitis suppurative ("HS") of the groin and axillary skin folds, caused non-infectious abscesses to form, which could rupture and drain blood and pus.  *Id.*  She wrote "[t]he pain is constant and precludes [Helwagen] from many types of everyday activities, including sitting for any length of time."  *Id.*

### 3.       Function Report – Lisa Helwagen

On June 2, 2020, Helwagen completed a function report, detailing her conditions and the limitations on her abilities they caused.  (Tr. 619-627).  She indicated that she had severe depression; anxiety; "panic;" PTSD; HS; brain meningioma; excessive sleepiness; headache disorder; lower back, hip, neck, and joint issues; and carpal tunnel in both arms.  (Tr. 619).  She also indicated she had high blood pressure, high cholesterol, pigment dispersion, lung nodules, thyroid nodules, restless leg syndrome, and acid reflux.  *Id.*  She noted that all of the conditions were worsening, and it was difficult on days to get up and function.  *Id.*

Helwagen explained that her typical day consisted of: getting coffee, feeding her dogs, resting or taking a nap, trying to start laundry or do dishes, fixing herself food, and letting the dogs out.  (Tr. 620).  She only took care of her dogs.  *Id.*  She could no longer walk far and sit or stand for long periods.  *Id.*  Her conditions affected her sleep by causing her to get up all night; making her uncomfortable due to the pain, which would cause her to stay in her pajamas some days; her HS causing her difficulty standing, showering, or sitting; struggling to put her arms over her head; and needing to sit to shave, which hurt her hips.  *Id.*

20

Helwagen indicated she did not need any reminders to take care of herself or take medicine.  (Tr. 622).  She could prepare her own meals, such as sandwiches, soup, burgers, or frozen pizza; and she did so daily or every other day.  *Id.*  It would take her 15 minutes to an hour to make, and her ability to stand for long periods had changed.  *Id.*  She could do laundry, dishes, and very minimal cleaning, but it could take her an entire day or more.  *Id.*  She would try to do house or yard chores, but her physical limitations could make it too much for her and, if she had a HS outbreak, it would be impossible.  (Tr. 623).  She could drive and ride in a car, and would drive occasionally.  *Id.*  She went shopping in stores and by phone for food and toiletries, about once or twice a month.  *Id.*  She could handle her own finances.  (Tr. 623-624).

Helwagen indicated her hobbies were watching television, using the internet, reading, attending swap meets, and shopping.  (Tr. 624).  She tried to do these every day, but some days she had no interest, or she was limited due to her conditions and her inability to walk or sit for long periods.  *Id.*  She would spend time with others by talking with them on the phone, and sometimes having company; but she did these things very infrequently.  *Id.*  She would go to doctors' offices and the grocery store, and only went when she had to.  *Id.*  She did not need someone to accompany her.  *Id.*  She indicated that her conditions affected her ability to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands.  (Tr. 625).  She did not finish what she started, needed to keep going back and rereading written instructions, and would forget spoken instructions.  *Id.*

Helwagen indicated she got along "okay" with authority figures, had not been fired or laid off because of problems with others, did not handle stress well, and struggled with changes in her routine.  (Tr. 626).  She did have unusual behaviors or fears, noting she feared something

21

bad would happen, would constantly worry, and would have flash backs and bad dreams.  *Id.*
She did not indicate that she used a cane.  *Id.*

### 4.      State Agency Consultants

#### a.      Physical Consultants

On June 16, 2020, Lynne Torello, M.D., reviewed the medical evidence to evaluate
Helwagen's physical limitations.  (Tr. 500-502).  She concluded that Helwagen was limited to
occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, and stand or
walk and sitting for 6 hours in an 8-hour workday.  (Tr. 500).  She also found that Helwagen
could never climb ladders, ropes, or scaffolds; could frequently balance; and could occasionally
climb ramps/stairs, stop, kneel, crouch, and crawl.  (Tr. 500-501).  She found that Helwagen was
also limited to frequent handling and fingering bilaterally, but was otherwise unlimited in her
manipulative abilities, and that she should avoid even moderate exposure to hazards.  (Tr. 501).

On September 14, 2020, Abraham Mikalov, M.D., reconsidered the medical evidence and
affirmed Dr. Torello's findings.  (Tr. 510-512).

#### b.      Mental Health Consultants

On June 15, 2020, Cindy Matyi, Ph.D., reviewed the medical evidence to evaluate
Helwagen's mental health limitations.  (Tr. 502-504).  She found that Helwagen had a moderate
limitation in her ability to understand and remember detailed instructions, but was otherwise not
significantly limited in her understanding and memory.  (Tr. 502-503).  She also found that
Helwagen was moderately limited in her ability to: (i) carry out detailed instructions,
(ii) maintain attention and concentration for extended periods, (iii) work in coordination with or
in proximity to others without being distracted by them, and (iv) complete a normal workday and
workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods.  (Tr. 503).  In all

other aspects of concentration and persistence, Dr. Matyi found her not significantly limited.  *Id.*

Dr. Matyi also found that Helwagen had a moderate limitation in her ability to interact

appropriately with the general public and to accept instructions and respond appropriately to

criticism from supervisors but was not otherwise significantly limited.  *Id.*  Finally, she

concluded Helwagen had a moderate limitation in her ability to respond appropriately to changes

in the work setting, but was not otherwise significantly limited.  (Tr. 503-504).

On September 14, 2020, Ermias Seleshi, M.D., reconsidered the medical evidence of

Helwagen's mental health limitations and affirmed Dr. Matyi's findings.  (Tr. 513-514).

### D.    Relevant Testimonial Evidence

Helwagen testified at the hearing.  (Tr. 414-428).  She lived with her mother at her

mother's house.  (Tr. 414-415).  She had a driver's license and a handicap placard.  (Tr. 415).

She testified that she could not work because of her carpal tunnel, knots in her joints, pain in her

back and hips that caused her to have to switch position every ten minutes, knee pain, anxiety,

and PTSD.  (Tr. 416).  As to her back and knee pain, she had been receiving injections, but had

yet to go to an orthopedist or surgeon because she was waiting to see if the injections helped.  *Id.*

Helwagen testified that she typically got up and 7:00 AM and would try to get up, after

being up or down all night, get coffee, feed the dog, and make any calls or anything she needed

to do first thing.  (Tr. 418).  Her doctor suggested she see a rheumatologist, but she had yet to see

one.  (Tr. 418-419).  She explained that her fingers were getting "caddywhompus" and becoming

deformed.  (Tr. 419).  After her morning, she would typically spend the rest of the day trying to

do household chores, which took her awhile because of the pain from standing, and she would

help with her mom, who had MS.  (Tr. 420).  She thought a gallon of milk was about the most

weight she could lift or carry, due to her hand and neck limitations.  (Tr. 420-421).  Due to

COVID, she'd had to stop many of the things that made her feel better, such as being around her

boyfriend's children, gardening, or helping with rescue animals.  (Tr. 421-422).  She also could

not garden because of her back, neck, and hands.  (Tr. 422-423).

   Helwagen testified that she went to counseling every two weeks, saw her psychiatrist

once a month or every few months (depending on how her psychiatrist felt), and saw her pain

management specialist once a month.  (Tr. 423).  She thought the injections she received helped

a little bit and would vary in how long they lasted, but they would reduce her pain from a range

of 5 to 8 down to 3.5 or 4.  (Tr. 424).  She would use a motorized cart when grocery shopping

and her pain management specialist prescribed a cane.  (Tr. 424-425).  Without the cane, she

could only stand or walk for about 5 minutes.  (Tr. 426-427).  She also had trouble staying asleep

and difficulty using a computer or writing because her hands and arms.  (Tr. 427).  She had

trouble standing and reaching into the dishwasher and her head was about as high as she could

reach overhead.  (Tr. 428).

## III.   Law & Analysis

### A.   Standard of Review

   The court's review of the Commissioner's final decision denying disability benefits is

limited to "whether the ALJ applied the correct legal standards and whether the findings of the

ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405

(6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant

evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted),

even if a preponderance of the evidence might support the opposite conclusion.  *O'Brien v.*

*Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will

24

not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.     Sentence Six Remand

Helwagen contends that the records provided to the Appeals Council were "new and material evidence" that showed "continuing deterioration of [her] impairments and should have resulted in a remand." ECF Doc. 8 at 23-24. Following the ALJ's decision, Helwagen submitted evidence from various providers dated after the ALJ's decision, (*see* Tr. 14-69, 136-186, 194-257, 284-308, 346-351), a letter from Dr. White (Tr. 283), and records predating the ALJ's decision, (*see* Tr. 78-92, 100-111, 120-127, 309-340).

The Commissioner disagrees, contending that the evidence is neither new, as some of it existed prior to the ALJ's decision, nor material. ECF Doc. 10 at 15-17. In her reply brief, Helwagen contends the records are new. ECF Doc. 11 at 2.

A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence Six of 42 U.S.C. § 405(g). To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into the record of a prior administrative proceeding. 42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993). "New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding. *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990). To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the

25

claimant's condition during the relevant period; and (2) probative, *i.e.*, has a reasonable probability that it would change the administrative result. *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014). And the Sixth Circuit takes a "harder line" approach to good cause – a claimant must establish good cause for why she did not cause the evidence to be created and produced until after the administrative proceeding. *See Perkins v. Apfel*, 14 F. App'x 593, 598-99 (6th Cir. 2001).

Helwagen has failed to establish that a Sentence Six remand is warranted. Helwagen effectively makes no argument in support of remand. Without any elaboration or explanation, she states "[a]lthough these records were for a period after the date of the ALJ's decision, the records constitute new and material evidence. This evidence documented continuing deterioration of Helwagen's impairments." ECF Doc. 8 at 24. Such conclusory assertions are insufficient to properly raise the argument before the court. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."). A review of the records, however, also does not support remand. Those records pre-dating the ALJ's decision would not be considered "new" and Helwagen presents no good cause for not obtaining them before the ALJ issued her decision (nor does the hearing transcript indicate any attributable delay). *See Finkelstein*, 496 U.S. at 626; *Perkins*, 14 F. App'x at 598-99. Further, those records that post-date the ALJ's decision are either immaterial, as they show Helwagen's "continued deterioration," or irrelevant because they reflect her condition after

26

the dates under consideration.  *See Casey*, 987 F.2d at 1233.  Accordingly, I recommend that

Helwagen's summary request for a Sentence Six remand be rejected.

### C.       Step Four: Subjective Symptom Complaints

Helwagen contends that the ALJ erred in evaluating her subjective symptom complaints

by failing to find that her pain would interfere with her ability to sustain activities.  ECF Doc. 8

at 19-20.  She states – without further explanation – that the ALJ's findings were contradictory,

in error, not supported by the record, and with insufficient analysis.  ECF Doc. 8 at 20.  The

Commissioner disagrees.  ECF Doc. 10 at 12-15.  Helwagen did not address this issue in her

reply brief.  *See* ECF Doc. 11.

A claimant's subjective symptom complaints are among the evidence that an ALJ must

consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e);

*Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or

other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether

she finds the claimant's subjective complaints consistent with objective medical evidence and

other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v.*

*Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for

discounting subjective complaints).  In conducting this analysis, the ALJ may consider several

factors, including claimant's efforts to alleviate her symptoms, whether any treatment was

effective, and any other factors concerning the claimant's functional limitations and restrictions.

SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also*

*Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ

properly considered a claimant's ability to perform day-to-day activities in determining whether

his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss

each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding that Helwagen's subjective symptoms complaints were not supported by the record.  *See Blakley*, 581 F.3d at 405.  Although unchallenged by Helwagen, the ALJ did acknowledge her obligations under SSR 16-3p in the review of Helwagen's subjective complaints.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19.  The ALJ also reviewed Helwagen's physical and mental health-related complaints, interspersed with her review of the medical evidence.  (*See* Tr. 361-364).  After noting both Helwagen's symptoms and the medical evidence, however, the ALJ made clear statements indicating that she found that the medical evidence did not support Helwagen's complaints.  (Tr. 362-364).

ALJ did not signal her supportability and consistency findings by using the buzzwords of "supportability" and "consistency," but reading the ALJ's analysis as a whole and with common sense, the ALJ clearly made those findings and articulated her reasons for rejecting Helwagen's complaints.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").  Regarding Helwagen's physical conditions, after the ALJ reviewed her complaints, the ALJ outlined the related medical evidence, and noted: (i) objective testing that indicated minimal limitations and

otherwise unremarkable findings, (ii) Helwagen's single evaluation for physical therapy, (iii) her minimal use of a nerve stimulator, (iv) the moderate to good success of injections, (v) the efficacy of her medications, and (vi) the consistent mild to benign findings on clinical examination.  (*See* Tr. 362-363).  Likewise, the ALJ summarized Helwagen's mental health complaints and proceeded to identify medical evidence that, logically, was inconsistent with Helwagen's complaints, such as the stabilization of her condition, her success in learning to cope with stressors, the efficacy of medication, and mild to benign mental status examinations.  (*See* Tr. 363-364).  Lastly, the ALJ indicated that Helwagen's daily activities, considered in combination, "strongly suggested" that she would be capable of engaging in work, even though none of them, standing alone, would have directed a non-disability finding.  (Tr. 364).

The ALJ did not draw a direct line from each medical record to the complaint she found that they contradicted.  However, the ALJ does not need to provide a comprehensive response to a claimant's complaints but must relate the evidence to her conclusions in a way that is sufficiently clear to permit meaningful review.  *Renstrom*, 680 F.3d at 1067; *Felisky*, 35 F.3d at 1036; *Fleischer*, 774 F. Supp.2d at 877.  When read with common sense, the ALJ's decision satisfied this obligation.

Moreover, the ALJ's conclusions are supported by substantial evidence.  Regarding Helwagen's physical complaints, such evidence includes: (i) her generally consistent normal examinations, noting a normal musculoskeletal system, range of motion, or only mild or moderate limitation in her spine (*see, e.g.,* Tr. 678, 702, 879-880, 949-950, 1107-1108, 1041, 1111-1112); (ii) her generally normal or only mild objective test results, (*see, e.g.*, Tr. 764, 961-965, 967); and (iii) her relatively conservative treatment, including only one physical therapy session, the lack of surgical intervention, and good results from injections (*see* Tr. 896,

910, 924, 930, 972-973, 1252, 1257, 1273, 1291).  *See Blakely*, 581 F.3d at 406.  As to

Helwagen's mental health complaints, the ALJ's finding was likewise supported by substantial

evidence, such as: (i) generally consistent mental status examinations finding Helwagen to be

normal, save for mild to moderate depression, (*see, e.g.,* Tr. 774-775, 788-789, 801-802, 821,

829-831, 853-855, 958-959, 1066, 1070, 1077, 1082, 1319-1320, 1339); (ii) the state agency

consultants' findings that Helwagen had – at most – only moderate limitations, (Tr. 502-504,

513-514); and (iii) Helwagen's statements to her medical providers that her medications were

helping or she was not experiencing side effects, (*see, e.g.*, Tr. 687, 829, 1315).  Accordingly,

because the ALJ's findings were supported by substantial evidence, they fall within the

Commissioner's "zone of choice."  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (holding

that the Commissioner enjoys a "zone of choice" within which to decide cases without being

second-guess by a court).  I recommend that Helwagen's argument on this point be rejected, and

the Commissioner's decision be affirmed.

       **D.**      **Step Four: Residual Functional Capacity**

       Helwagen contends that the ALJ erred in making her RFC findings by failing to include a

limitation for cane usage and concluding that Helwagen could perform work at the light

exertional level.  ECF Doc. 8 at 11, 21.  Helwagen argues that she had a cane prescribed for her

lower back pain and the prescription reflected that it was for more than her own subjective

desire, none of which the ALJ discussed.  ECF Doc 8 at 11-12.  As to the ALJ's light work

finding, Helwagen argues that the record shows that she could not lift over 10 pounds, or use her

hand to the level required for light work.  ECF Doc. 8 at 21-22.  Although embedded within her

argument concerning her subjective symptom complaints, Helwagen also contends that the ALJ

failed to account for her non-severe impairments when she made her RFC findings.  ECF Doc. 8

at 19.  The Commissioner disagrees.  ECF Doc. 10 at 8-12.  In her reply brief, Helwagen contends that the prescription was sufficient to establish that her cane was a medical necessity. ECF Doc. 11 at 1-2.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

For an assistive device to be considered a restriction or limitation, there must be sufficient evidence in the record to obligate the ALJ to conclude that the device is "medically necessary," based on a showing that it is more than the plaintiff's subjective desire to use the device.  *See Murphy v. Astrue*, No. 2:11-CV-00114, 2013 U.S. Dist. LEXIS 30492, at *28 (M.D. Tenn. Mar. 6, 2013) (internal citations omitted).  Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device, but the ALJ did not include – with no explanation for the silence – the use of the device in the RFC.  *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* No. 1:17-CV-1075, 2018 U.S. Dist. LEXIS 32651, at *43 (N.D. Ohio Feb. 12, 2018).  However, in order for an ALJ to find that an assistive device was medically necessary, there must be medical documentation establishing the

need for the device to aid in walking or standing, and documentation "describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distances and terrain; and any other relevant information)."  SSR 96-9p, 1996 SSR LEXIS 6, at *20.

The ALJ applied the correct legal standards and reached a determination supported by substantial evidence in determining Helwagen's RFC.  *See Blakley*, 581 F.3d at 405.  First, as to the ALJ's failure to discuss a cane or provide any limitation based off of it, Helwagen's claim fails because she did not establish that the cane was medically necessary.  *See Murphy*, 2013 U.S. Dist. LEXIS 30492, at *28.  Helwagen's "prescription" did not even note that it was for Helwagen and failed to provide any description for the circumstances when it was to be used, other than stating "to assist with ambulation."  (Tr. 1545).  As such, even if the ALJ should have discussed the "prescription" or Helwagen's subjective complaints regarding her use of a cane, the error would ultimately be harmless because the "prescription" did not describe with any level of specificity the "circumstances for which it is needed."  *See* SSR 96-9p, 1996 SSR LEXIS 6, at *20; *Cruz-Ridolfi*, 2018 U.S. Dist. LEXIS 32651, at *43.  Moreover, the ALJ did discuss Helwagen's cane prescription in her Listings analysis at Step Three.  (Tr. 359).  There, the ALJ noted that Helwagen's "clinical studies . . . described a normal gait," which disproved an inability to ambulate effectively.  In light of that, the ALJ found that "the prescription for a cane . . . is unconvincing, the more so because it does not name a particular patient."  (*Id.*)  Thus, the ALJ did not err by excluding the need to use a cane from her RFC findings.

As to the ALJ's determination that Helwagen retained the ability to perform light work, Helwagen's challenge also fails.  Helwagen has not pointed to any specific evidence that the ALJ failed to address, and which directly undermined the ALJ's finding that Helwagen could work at

the light exertional level.  *See* ECF Doc. 8 at 21-22.  Rather, she cited a generous portion of

medical evidence, accompanied by the conclusory statement that the evidence showed the ALJ's

decision lacked the support of substantial evidence.  ECF Doc. 8 at 13-18, 21.  This was not only

unhelpful, but also mischaracterized the substantial evidence standard.  Pointing to evidence that

might have supported different limitations than those found by the ALJ, begs the question of

whether the ALJ's decision was supported by substantial evidence.  Even if a preponderance of

the evidence in the record could have supported a different conclusion, once it is determined that

substantial evidence supported the ALJ's evaluation, the ALJ's decision cannot be rejected on

that basis.  *O'Brien v. Comm's of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).

And a review of the record indicates that substantial evidence does support the ALJ's

finding that Helwagen could perform work at the light exertional level.  Such evidence includes:

(i) objective tests indicating her nerves and knees were normal, had no damage, or were only

mildly limited, (Tr. 965, 967, 1296); (ii) her history of conservative treatment, such as injections,

a brace, and Dr. Yang's encouragement to continue her medication, engage in physical therapy,

and perform exercises (Tr. 880-881, 884, 888-889, 892-893, 896-897, 900-901, 913-914,

923-924, 929-930, 932, 937-938, 941-942, 954-955); (iii) treatment notes indicated that

Helwagen had only mild to moderate limitation in movement in her spine and was responding

well to injections (*see, e.g.,* Tr. 677-678, 700, 702, 879-880, 896, 924, 930, 949-950, 1107-1108,

1041, 1111-1112, 1252, 1291); and (iv) treatment notes indicating Helwagen's motor strength

was normal, (Tr. 1461, 1472).

Additionally, Helwagen contends that the ALJ's evaluation of her subjective symptom

complaints was erroneous because he did not explicitly account for her chronic mixed headache

syndrome, brain meningioma, glaucoma, HS, urinary problems, and osteoarthritis.  ECF Doc. 8

at 19.  Helwagen has not challenged the ALJ's finding that these conditions were non-severe impairments, but contends that the ALJ failed to consider them with her symptoms.  *Id.*  The ALJ must consider the non-severe impairments in evaluating Helwagen's RFC.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps.") (citing 20 C.F.R. § 404.1545(e)).  However, "[c]ourts have held that an ALJ need not specifically discuss all non-severe impairments in the RFC assessment when the ALJ makes clear that his decision is controlled by SSR 96-9p."  *Nelson v. Comm'r of Soc. Sec.*, No. 1:21-CV-01784, 2023 U.S. Dist. LEXIS 40644, at *50 (N.D. Ohio Jan. 31, 2023) (citing *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851-52 (6th Cir. 2020), *Turner v. Comm'r of Soc. Sec.*, 2021 U.S. App. LEXIS 29160, at *9-10 (6th Cir. 2021); and *Davis v. Comm's of Soc. Sec.*, 2015 U.S. Dist. LEXIS 124819, at *9-11 (W.D. Mich. Sept. 18, 2015)).

Here, the ALJ noted in his summary of the applicable law that he was required to comply with SSR 96-8p's requirement to "consider all of the claimant's impairments, including impairments that are not severe[.]"  (Tr. 357).  And at Step Two, the ALJ considered Helwagen's non-severe impairments, determining that "[a] combination of factors . . . indicate that the existence of these conditions will not cause more than minimal limitations on the claimant's ability to engage in basic work activity and are therefore non-severe."  (Tr. 358).  Additionally, the ALJ stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's [RFC]."  (Tr. 358-359).  As a result, Helwagen has not established that the ALJ reversibly erred by not specifically addressing her non-severe impairments.  *See Nelson*, 2023 U.S. Dist. LEXIS 40644, at *50.

Moreover, Helwagen has presented no arguments in support of how or why these non-severe impairments should have altered the ALJ's RFC.  Even if the court were to dive into the ALJ's analysis of these impairments, nothing in the court's review of the medical evidence indicates that these impairments would undermine the RFC and support a remand.  *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted)).  Specifically, the record indicates that (i) Helwagen did not submit any dermatological treatment notes before the ALJ; (ii) she indicated that her glaucoma was well controlled by her medication (*see* Tr. 486); (iii) there were no side effects noted from her meningioma (*see* Tr. 1473); (iv) there were no treatment notes regarding her urinary incontinence following the excision of her bladder mesh that indicated her incontinence continued (*see* Tr. 1084-1097); and (v) there were no notes regarding a mixed headache syndrome, and her neurologist recommended waiting to see if any changes occurred (*see* Tr. 1461-62).  As to her osteoarthritis, Helwagen is unclear in which diagnoses she asserts the ALJ should have but failed to consider – whether related to her knees or her hands.  (Tr. 1256, 1547).  Regardless, the ALJ referenced "arthritis" in her complaints (Tr. 362) and her treatment notes indicate she was prescribed Voltaren gel (Tr. 1257).  And the ALJ's RFC indicated that both Helwagen's knees and hands were considered, by finding bilateral handling and fingering limitations .  (Tr. 361).  Helwagen has presented no argument as to why – based on the record evidence – the ALJ's limitations were insufficient.  Accordingly, even if the ALJ could have more explicitly considered these impairments, substantial evidence supported the ALJ's determination that these impairments did not support a finding that Helwagen was disabled.  *See Fisher,* 869 F.2d at 1057.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Helwagen's applications for DIB and SSI be affirmed.

Dated: April 20, 2023

Thomas M. Parker
United States Magistrate Judge

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).